Mr. Barry Emigh 1104 7th Street Hot Springs, AR 71913-4225
Dear Mr. Emigh:
This is in response to your request for certification, pursuant to A.C.A. § 7-9-107 (Repl. 2000), of the following popular name and ballot title for a proposed constitutional amendment:
 Popular Name AN AMENDMENT TO FORMULATE THE FUNDING SCHOOLS AND REFORM TAX ASSESSMENTS
 Ballot Title AN AMENDMENT TO THE ARKANSAS CONSTITUTION AUTHORIZING THE GENERAL ASSEMBLY TO PLACE A PROPERTY TAX MILLAGE RATE ON THE REGULAR GENERAL BALLOT FOR ACCEPTANCE OR REJECTION BY THE VOTERS OF THE STATE WHICH SHALL BE SOLELY USED FOR EDUCATION; THE PURCAHSE [SIC] PRICE OF ANY REAL PROPERTY SHALL BE THE ASSESSED VALUE UNTIL TRANSFERED [SIC] WITH EXCEPTION; REQUIRING THE GENERAL ASSEMBLY TO NEGOCIATE [SIC] WITH ANY AND ALL TEACHER UNIONS COLLECTIVELY TO SET A MINIMUM HOURLY PAY OR SALARY FOR TEACHERS BASED ON THE NUMBER OF STUDENTS IN A CLASS, TO NEGOCIATE [SIC] AND SET A MINIMUM AND MAXIMUM NUMBER OF STUDENTS PER TEACHER WITHIN A CLASS, TO NEGOCIATE [SIC] AND SET OTHER TEACHER BENEFITS TO INCLUDE YEARS OF SERVICE, PENSIONS AND HEALTH INSURANCE, TO NEGOCIATE [SIC] AND SET A STANDARD CURRICULUM FOR K THRU 12TH GRADES TO INCLUDE THE SELECTION OF TEXT BOOKS AND OTHER INSTRUCTIONAL MATERIALS; EMPOWERING THE GENERAL ASSEMBLY BY A 3/4 VOTE OF CONSENT TO OVER RIDE ANY UNION NEGOCIATIONS; [SIC] REQUIRING THE GENERAL ASSEMBLY SET A MINIMUM HOURLY RATE OR SALARY FOR EACH SCHOOL ADMINISTRATOR AND FOR DISTRICT SCHOOL ADMINISTRATORS TO INCLUDE THE COST OF ADMINISTRATION BASED ON THE NUMBER OF STUDENTS WITHIN EACH SCHOOL AND SCHOOL DISTRICT; THE GENERAL ASSEMBLY SHALL SET A REQUIREMENT FOR THE COSTRUCTION [SIC] OF NEW SCHOOLS AND MAINTENANCE BASED ON THE NUMBER OF STUDENTS; REQUIRING THE GENERAL ASSEMBLY TO PAY FOR ALL REQUIRED COSTS OVER THE PROPERTY TAX MILLAGE FROM THE STATE'S GENERAL FUND; REQUIRING THE GENERAL ASSEMBLY TO NEGOCIATE [SIC] WITH ANY ONE OR MORE TEACHER UNIONS COLLECTIVELY; THE STATE SHALL BE REQUIRED TO PAY FOR ALL SCHOOL TRANSPORTATION COSTS WITHIN THE STATE; UNLESS PROVIDED FOR DIFFERENTLY THE GENERAL ASSEMBLY SHALL REGUALTE [SIC] ALL SCHOOLS WITHIN THE STATE; MAKING THE AMENDMENT EFFECTIVE IMMEDIATELY UPON PASSAGE EXCEPT AS OTHERWISE PROVIDED IN THE AMENDMENT; MAKING THE AMENDMENT SEVERABLE; AND REPEALING ALL LAWS AND CONSTITUTIONAL AMENDMENTS IN CONFLICT WITH THE AMENDMENT
The Attorney General is required, pursuant to A.C.A. § 7-9-107, to certify the popular name and ballot title of all proposed initiative and referendum acts or amendments before the petitions are circulated for signature. The law provides that the Attorney General may substitute and certify a more suitable and correct popular name and ballot title, if he can do so, or if the proposed popular name and ballot title are sufficiently misleading, may reject the entire petition.
A.C.A. § 7-9-107 neither requires nor authorizes this office to make legal determinations concerning the merits of the act or amendment, or concerning the likelihood that it will accomplish its stated objective. Consequently, this review has been limited to a determination, pursuant to the guidelines that have been set forth by the Arkansas Supreme Court, discussed below, of whether the proposed popular name and ballot title accurately and impartially summarize the provisions of your proposed amendment or act.
The purpose of my review and certification is to ensure that the popular name and ballot title honestly, intelligibly, and fairly set forth the purpose of the proposed amendment or act. See Arkansas Women's PoliticalCaucus v. Riviere, 282 Ark. 463, 466, 677 S.W.2d 846 (1984).
The popular name is primarily a useful legislative device. Pafford v.Hall, 217 Ark. 734, 233 S.W.2d 72 (1950). It need not contain detailed information or include exceptions that might be required of a ballot title, but it must not be misleading or give partisan coloring to the merit of the proposal. Chaney v. Bryant, 259 Ark. 294, 532 S.W.2d 741
(1976); Moore v. Hall, 229 Ark. 411, 316 S.W.2d 207 (1958). The popular name is to be considered together with the ballot title in determining the ballot title's sufficiency. Id.
The ballot title must include an impartial summary of the proposed amendment or act that will give the voter a fair understanding of the issues presented. Hoban v. Hall, 229 Ark. 416, 417, 316 S.W.2d 185
(1958); Becker v. Riviere, 270 Ark. 219, 223, 226, 604 S.W.2d 555
(1980). According to the court, if information omitted from the ballot title is an "essential fact which would give the voter serious ground for reflection, it must be disclosed." Bailey v. McCuen, 318 Ark. 277, 285,884 S.W.2d 938 (1994), citing Finn v. McCuen, 303 Ark. 418, 798 S.W.2d 34
(1990); Gaines v. McCuen, 296 Ark. 513, 758 S.W.2d 403 (1988); Hoban v.Hall, supra; and Walton v. McDonald, 192 Ark. 1155, 97 S.W.2d 81 (1936). At the same time, however, a ballot title must be brief and concise (see
A.C.A. § 7-9-107(b)); otherwise voters could run afoul of A.C.A. §7-5-522's five minute limit in voting booths when other voters are waiting in line. Bailey v. McCuen, supra. The ballot title is not required to be perfect, nor is it reasonable to expect the title to cover or anticipate every possible legal argument the proposed measure might evoke. Plugge v. McCuen, 310 Ark. 654, 841 S.W.2d 139 (1992). The title, however, must be free from any misleading tendency, whether by amplification, omission, or fallacy; it must not be tinged with partisan coloring. Id. A ballot title must convey an intelligible idea of the scope and significance of a proposed change in the law. Christian CivicAction Committee v. McCuen, 318 Ark. 241, 884 S.W.2d 605 (1994). It has been stated that the ballot title must be: 1) intelligible, 2) honest, and 3) impartial. Becker v. McCuen, 303 Ark. 482, 798 S.W.2d 71 (1990), citing Leigh v. Hall, 232 Ark. 558, 339 S.W.2d 104 (1960).
Having analyzed your proposed amendment, as well as your proposed popular name and ballot title under the above precepts, it is my conclusion that I must reject your proposed popular name and ballot title due to ambiguities in the text of your proposed measure. A number of additions or changes to your ballot title are, in my view, necessary in order to more fully and correctly summarize your proposal. I cannot, however, at this time, fairly or completely summarize the effect of your proposed measure to the electorate in a popular name or ballot title without the resolution of the ambiguities. I am therefore unable to substitute and certify a more suitable and correct popular name and ballot title pursuant to A.C.A. § 7-9-107(b).
I refer to the following ambiguities:
1. Paragraph 1 of section 1 of your proposed amendment provides:
 The General Assembly shall be empowered during any regular session of the General Assembly to place on the regular general ballot a measure to increase or decrease a property tax millage for the voters of the State to accept or reject which shall be collected by the county clerks and paid to the State solely for educational purposes.
 This provision is confusing in that it fails to specify what property tax will be subject to "increase or decrease" by voter approval. If you mean to establish a state property tax that is subject to change, you should say so. As written, this provision authorizes only voter approval of an increase or decrease in an existing tax; it does not, as I suspect you intend, authorize a new property tax millage to be directed to the state to be used for educational purposes.
 This provision further conflicts with paragraph 2 of section 1 in declaring that the millage will be used "solely for educational purposes." Paragraph 2 of section 1, which is discussed immediately below, suggests that at least a portion of the property tax will not be paid to the state for educational purposes. Your proposed amendment is consequently unclear regarding the apportionment of the tax at issue.
 This provision is further confusing in dictating without elaboration that the proposed millage "shall be collected by the county clerks and paid to the State." If you are proposing a system for the collection of property taxes that differs from the one currently in place, you should specify precisely how the system will operate.
 This provision is further confusing in that Ark. Const. amend. 74
already provides for voter approval of property tax millages devoted to the maintenance and operation of schools. For instance, House Bill 1162, which is currently pending in the legislature, would seek the voters' approval of a 3-mill increase in the uniform rate of tax. How does your proposal differ from that already in effect?
2. Paragraph 2 of section 1 of your proposed amendment provides:
 Any amount of property tax millage over the required millage, as provided in (1) of this Section, shall be retained and used by those counties and or cities of origin as is applicable to the law.
 This provision is confusing in that it is unclear what portion of the total property tax will comprise "the required millage." The provision is further unclear in that you fail to specify what you mean by the term "the required millage." Required for what? All educational expenses? If so, this paragraph conflicts with paragraph 9 of section 3 of your proposed amendment, which clearly anticipates that the property tax millage at issue may not be sufficient to meet all educational needs. It is further unclear what you mean in declaring that "tax millage over the required millage" will be used "as is applicable to the law."
3. Paragraph 3 of section 1 of your proposed amendment provides:
 The Quarum [sic] Court shall retain the right to place a millage increase or decrease over the amount of the state property tax millage, as provided in (1) of this Section, on the ballot at any time for acceptance or rejection by the local voters.
 This provision is confusing in that it implies that paragraph 1 of section 1 of your proposed amendment imposes a separate state property tax millage. As noted above, paragraph 1 of section 1 is confusing on this score.
4. Paragraph 1 of section 2 of your proposed amendment provides:
 The purchase price of any real property by a person shall be the assessed value of that real property until transferred.
 This provision is confusing in that it appears to dictate that the assessed value of property will remain fixed throughout the time an individual owns the property. If you indeed intend to prohibit the practice of periodic reappraisals of property, you should say so more directly.
5. Paragraph 2 of section 2 of your proposed amendment provides:
 Upon transfer of any real property as an inheritance the county clerk shall be required within one year from the date of transfer to obtain a value assessment by any independent property assessor at the cost of the transferee.
 This provision is confusing in that it fails to specify what tax treatment will apply to the property during the taxable year following the transfer and before the assessment. What is the county clerk supposed to do with the assessment? What elements, if any, of the current system for assessing and taxing property do you intend to preserve?
6. Paragraph 3 of section 2 of your proposed amendment provides:
 Any property transferred of questionable price below market value the county clerk may upon their [sic] own discretion within one year from the date of transfer obtain a value assessment by any independent property assessor at the cost of the county.
 This provision is confusing in that the syntax is garbled. For instance, no verb applies to the noun "property." The provision is further confusing in that you fail to specify who will determine that a transfer is "of questionable price below market value." You further fail to specify how this determination will be made. You further fail to specify what tax treatment will apply to the property during the taxable year following the transfer and before the assessment.
7. Paragraph 4 of section 2 of your proposed amendment provides:
 The construction cost of any real property to included [sic] labor and materials shall be added to the assessed value of that real property upon completion of any permitted construction.
 This provision is confusing in that you fail to specify what will comprise "construction cost"; merely declaring that it will "include labor and materials" implies that it will "include" something else. The provision is further unclear as to whether all property will be reassessed immediately upon the completion of any construction of any sort upon the property or whether the reassessment will occur in what would otherwise be the normal course.
8. Paragraph 5 of section 2 of your proposed amendment provides:
 The rights of personal property ownership shall be respected and no assessment of any real property shall be conducted by the state, counties, and or any agency thereof; unless, provided for differently within this amendment.
 This provision is confusing in that you provide no guidance as to how the declaration that "[t]he rights of personal property ownership shall be respected" relates to the rest of the provision, which deals with the assessment of real property. What specifically are you proposing to ensure that "[t]he rights of personal property ownership shall be respected"?
 The provision is further confusing in that, after prohibiting the assessment of real property by any entity whatsoever" unless, provided for differently within this amendment," it fails to specify who will conduct assessments, when and how.
9. Paragraph 1 of section 3 of your proposed amendment provides:
 The General Assembly shall be required to negociate [sic] with any authorized teacher's union(s) and set a minimum hourly pay or salary for teachers based on the number of students per class hour of educational instruction.
 This provision is confusing in that it is unclear what you mean by the term "authorized teacher's union(s)." Authorized by whom? It is further unclear what type of negotiations would be required and what would happen if such negotiations failed to result in a consensus. It is further unclear what relationship such negotiations would bear to the General Assembly's obligation to "set a minimum hourly pay or salary for teachers." Finally, it is unclear whether you anticipate teachers being paid on an hourly rate or on a salary basis.
10. Paragraph 2 of section 3 of your proposed amendment provides:
 The General Assembly shall be required to negociate [sic] with any authorized teacher's union(s) and set a minimum and maximum number of students per class room per teacher.
 This provision is confusing in that it is unclear what you mean by the term "authorized teacher's union(s)." Authorized by whom? It is further unclear what type of negotiations would be required and what would happen if such negotiations failed to result in a consensus. It is further unclear what relationship such negotiations would bear to the General Assembly's obligation to "set a minimum and maximum number of students per class room per teacher."
11. Paragraph 3 of section 3 of your proposed amendment provides:
 The General Assembly shall be required to negociate [sic] with any authorized teacher's union(s) to set any increased percentage of hourly pay or salary increase to be paid to each teacher for each year of teaching service, cost of living increase, health insurance, retirement pay and any, and all, other benefits and payments of any kind which shall be paid on a per student basis.
 This provision is confusing in that it is unclear what you mean by the term "authorized teacher's union(s)." Authorized by whom? It is further unclear what type of negotiations would be required and what would happen if such negotiations failed to result in a consensus. It is further unclear what relationship such negotiations would bear to the General Assembly's obligation to set the referenced payments. The provision is further unclear in its reference to" any, and all, other benefits and payments of any kind which shall be paid on a per student basis." What are these benefits? Moreover, are salaries to be pegged to years of teaching experience, a per-student index or both?
12. Paragraph 4 of section 3 of your proposed amendment provides:
 The General Assembly shall be required to negociate [sic] with any authorized teacher's union(s) and set a required curriculum based on hourly instruction for all public schools k-12 to include but not [be] limited to math, science, english [sic], art, music and physical education which shall be the same for all schools.
 This provision is confusing in that it is unclear what you mean by the term "authorized teacher's union(s)." Authorized by whom? It is further unclear what type of negotiations would be required and what would happen if such negotiations failed to result in a consensus. It is further unclear what relationship such negotiations would bear to the General Assembly's obligation to set curricula.
13. Paragraph 5 of section 3 of your proposed amendment provides:
 The General Assembly shall be required [to] negociate [sic] with any authorized teacher's union(s) to select any, and all, text books and other required instructional materials which shall be purchased and warehoused by the State and distribute[d] to each school on a per student basis to include, but not [be] limited to musical instruments, in-school library books, computers and other educational resources.
 This provision is confusing in that it is unclear what you mean by the term "authorized teacher's union(s)." Authorized by whom? It is further unclear what type of negotiations would be required and what would happen if such negotiations failed to result in a consensus. It is further unclear what relationship such negotiations would bear to the General Assembly's obligation to select the recited materials.
14. Paragraph 6 of section 3 of your proposed amendment provides:
 The General Assembly shall by a ½ majority vote of consent shall [sic] be empowered to over ride or void any union negociation [sic] process.
 This provision is confusing in that your proposed amendment at no point clarifies how the referenced "union negotiation process" would work. What precisely would the General Assembly be overriding? What would happen if the legislature and the union could not reach a consensus but the legislature could not manage the supermajority vote required to "override" the "union negotiation process"? And what does it mean to "override" a "process" that has presumably not resulted in any otherwise binding resolution?
15. Paragraph 7 of section 3 of your proposed amendment provides:
 The General Assembly shall be required to set a minimum hourly pay or salary for all individual school administrators and other costs to be paid for individual school administration based on the number of students within a school.
 This provision is confusing in its reference to "other costs to be paid for individual school administration." What" other costs"? And precisely what is "individual school administration" as distinct from the "district school administration" you address in paragraph 8 of section 3? What is the difference between an "individual school" and a "district school"? See discussion immediately below.
16. Paragraph 8 of section 3 of your proposed amendment provides:
 The General Assembly shall be required to set a minimum hourly pay or salary for all district school administrators and other costs to be paid for district school administration based on the number of students within a school.
 This paragraph is confusing in that I am unable to determine how it differs in any material respect from paragraph 7. You need to clarify the distinction you are attempting to draw in these two paragraphs.
17. Paragraph 9 of section 3 of your proposed amendment provides:
 To meet any, and all, financial obligations, as provided within this amendment, to include but not [be] limited to teacher pay, text books and administrative costs any money not covered by the property tax, as provided in Section 1(1)(2) [sic] of this amendment, shall be paid from the State's general fund which shall be paid on a per student basis.
 This provision is confusing in that the referenced paragraphs 1 and 2 of section 1 of your proposed amendment do not establish a property tax, as you imply in the paragraph at issue here; rather, they merely authorize increasing and decreasing an unidentified property tax. This paragraph further conflicts with paragraph 2 of section 1, which suggests that a "required" property tax millage will be sufficient to meet educational expenses.
18. Paragraph 10 of section 3 of your proposed amendment provides:
 The General Assembly shall be required to negociate [sic] with any authorized teacher's union(s) and set any additional hourly payment requirements which shall be paid to teachers per student for those disabled or disadvantaged students to further include, but not [be] limited to counseling, drug testing and treatment which shall be paid on a per student basis.
 This provision is confusing in that it is unclear what you mean by the term "authorized teacher's union(s)." Authorized by whom? It is further unclear what type of negotiations would be required and what would happen if such negotiations failed to result in a consensus. It is further unclear what relationship such negotiations would bear to the General Assembly's obligation to make the additional payments. It is further unclear what you mean by the term "disabled or disadvantaged students." Who determines what constitutes disability or disadvantage?
19. Paragraph 11 of section 3 of you proposed amendment provides:
 The General Assembly shall set the requirements for construction of any new schools and maintenance of existing schools which shall be paid based on a per student basis.
 This provision is confusing in that it is unclear what you mean in suggesting that construction and maintenance costs can be "paid based on a per student basis." If you mean to say that the size of the construction and maintenance budgets of various schools will be determined by their relative student populations, you should say so directly.
20. Paragraph 12 of section 3 of your proposed amendment provides:
 If more than one union represents any number of teachers within the State the General Assembly shall be required to negociate [sic] with all unions collectively.
 This provision is confusing in that you never specify in your proposed amendment how the negotiation process will proceed, what its goals are to be and what relationship its resolution will have to the General Assembly's proposed legislative obligations with respect to education.
21. Paragraph 13 of section 3 of your proposed amendment provides:
 Unless provided for differently within the provisions of this amendment the General Assembly shall be empowered to regulate all schools within the State.
 This provision is confusing in that it is unclear whether you intend to grant the General Assembly a degree of discretion unqualified by the current constitutional guarantee of "a general, suitable and efficient system of free public schools." Ark. Const. art. 14, § 1. If you intend to qualify legislative discretion by giving continued effect to the general education article of the current constitution, you should say so.
22. Paragraph 14 of section 3 of your proposed amendment provides:
 The General Assembly shall be required to negociate [sic] with any union(s) collectively representing bus drivers, and other employees providing services to school bus transportation.
 This provision is confusing in that you never specify in your proposed amendment how the negotiation process will proceed, what its goals are to be and what relationship its resolution will have to any legislation the General Assembly may enact relating to school bus transportation.
23. Paragraph 15 of section 3 of your proposed amendment provides:
 The General Assembly shall be required to pay for all busing and transportation costs within the State.
 This provision is confusing in that it fails to specify precisely what "busing and transportation costs" you mean. If you mean the busing and transportation of school children, you should say so.
24. Section 4 of your proposed amendment provides:
 The provisions of this amendment shall take effect immediately upon passage of this amendment except as otherwise provided. The General Assembly shall be required to make any and all other laws, rules and regulations to the enforcement of this Constitutional Amendment.
 This provision is confusing in that the first sentence suggests that the amendment will be self-executing, whereas the second sentence suggests that it will not. The second sentence is further confusing in that it suggests that the General Assembly, which is a legislative body, will be assigned the essentially executive task of promulgating" rules and regulations." If you intend to invest the legislature with what in the past have been executive agency functions, you should say so directly.
 25. Your proposed amendment generally contains numerous errors in punctuation, spelling and syntax. Should you elect to revise your submission, you should address these grammatical problems.
My office, in the certification of ballot titles and popular names, does not concern itself with the merits, philosophy, or ideology of proposed measures. I have no constitutional role in the shaping or drafting of such measures. My statutory mandate is embodied only in A.C.A. § 7-9-107
and my duty is to the electorate. I am not your counsel in this matter and cannot advise you as to the substance of your proposal.
At the same time, however, the Arkansas Supreme Court, through its decisions, has placed a practical duty on the Attorney General, in exercising his statutory duty, to include language in a ballot title about the effects of a proposed measure on current law. See, e.g., Finnv. McCuen, 303 Ark. 418, 793 S.W.2d 34 (1990). Furthermore, the Court has recently confirmed that a proposed amendment cannot be approved if "[t]he text of the proposed amendment itself contribute[s] to the confusion and disconnect between the language in the popular name and the ballot title and the language in the proposed measure." Roberts v. Priest,341 Ark. 813, 20 S.W.3d 376 (2000). The Court concluded: "[I]nternal inconsistencies would inevitably lead to confusion in drafting a popular name and ballot title and to confusion in the ballot title itself." Id.
Where the effects of a proposed measure on current law are unclear or ambiguous, it is impossible for me to perform my statutory duty to the satisfaction of the Arkansas Supreme Court without clarification of the ambiguities.
My statutory duty, under these circumstances, is to reject your proposed ballot title, stating my reasons therefor, and to instruct you to "redesign" the proposed measure and ballot title. See A.C.A. §7-9-107(c). You may, after clarification of the matter discussed above, resubmit your proposed amendment, along with a proposed popular name and ballot title, at your convenience. I anticipate, as noted above, that some changes or additions to your submitted ballot title may be necessary. I will be pleased to perform my statutory duties in this regard in a timely manner after resubmission.
Sincerely,
MIKE BEEBE Attorney General
MB/cyh
Enclosure